I call our last case of today United States v. Ludwikowski, number 18-1881, Ms. Mathewson and Mr. Gross. I call our last case of today United States v. Ludwikowski, number 18-1881, Ms. Mathewson Good afternoon. Good afternoon, Your Honors. May it please the Court, Lisa Mathewson for Michael Ludwikowski. I'd like to reserve two minutes for rebuttal. Your Honors, this is a truly unusual case. A seven-hour un-Mirandized interrogation of someone whom police summoned to the station house to question Of those seven hours, how much was actual questioning? Four hours was actual questioning, Your Honor. And of those four hours, how much was it that you termed to be aggressive questioning? I haven't actually quantified that, Your Honor. If I had to take a guess, I would say that it was interspersed. And however, it was the, in fact, very good cop, bad cop nature of the questioning. It was the juxtaposition of the lulling assurances, the friendly, we know you haven't done anything wrong. The, we know you haven't done anything criminal. You're not in any trouble. The one who said, we're not accusing you of anything at this point, of having done anything wrong, was the so-called bad cop. It was interesting, Your Honor. This, to me, comes in three segments here. It was the second segment that was more aggressive than the other two. And toward the end, two statements in a row were made by the so-called bad cop, in quotes, that were not necessarily, I forget exactly how it's said, but it essentially is, we're not here accusing you at this time of anything. Your Honor, the most direct statement came at, I believe it was approximately 4 p.m. when he said, you haven't done anything criminal. However, there were numerous statements, and that, interestingly, was juxtaposed just a few minutes before, and literally a couple of pages before, with some of the most direct and accusatory questioning in the case. Not just questioning, but actual accusations. There's quite a lot of evidence against you, they said, for example. They hinted at the possibility of a future prosecution. Well, when they were reading the transcripts, I mean, it was clear that the person who was making the statements on the transcripts of messages and whatnot were essentially claiming that he was part of the deal, part of their conspiracy, whatever you want to call it. And so, if you're a police officer, you're saying, wait a minute, why are they claiming that you're in on this with them? I mean, that would seem to be a normal question. Your Honor, it's crucial at the outset for me to clarify that we take no issue with any of the legitimate law enforcement purpose for investigating the illegal dispensing of oxycodone. In fact, Your Honor, it is a perfectly legitimate question. What it is not, however, is an attempt to solve the extortion. My client was summoned to the police station. He volunteered to go to the police station. He wasn't summoned. He reached out to the police saying, hey, I'm going to do an extortion. I'm worried about my safety based on some messages that have been given. And my family. And my family, correct. He opts to go there in lieu of a conversation at the pharmacy. Your Honor, actually, that is one factual correction. He had had a few conversations with the officers on the 21st and 22nd of June. They instructed him to come to the station house. So, undoubtedly. He doesn't say, let's meet somewhere else. He doesn't suggest Starbucks. And, in fact, he had several days to think about it before he showed up, right? Unquestionably, Your Honor, he was seeking the help of the police. And unquestionably, he was seeking the help of the police in solving an extortion. The police knew that. What they did not. In custody. I'm sorry? At the end of the day, there are really two questions. Was he in custody or was it a voluntary statement? Yes. Judge Simandl found there was no custodial interrogation. And reviewing the tape, what I saw was a room. The door was open and closed. It was closed most of the time when the police were there. But they would leave him there alone with his cell phone. He looked rather relaxed. Almost like when one of us might be waiting to go see the dentist or a doctor. Playing with his cell phone. At any point, he could have used his cell phone to call a lawyer. He could have used his cell phone to call an Uber. He could have left. How was that custodial interrogation? The fact that he didn't, Your Honor, is precisely our point. Because on both of those points, Your Honor, of course, first the custody inquiry is objective. It is not what did this individual do? How did this individual appear? Did he seem relaxed? Did he pick up his cell phone? That goes to voluntariness alone, Your Honor. The reasonable person standard, of course, asks what, under the seven Jacobs factors, which way do these things cut as to whether a reasonable person would perceive that he was free to leave? And I'll get to those. Do you have any question if he got up and he said, you know what, I don't like the way this is going. I'm just out of here. Do you think they would have stopped him? Absolutely, Your Honor. And here's how we know that. There are several indications. And to go to Judge Restrepo's point about his not having left, let's consider what someone who feels free to leave would have done when left alone in a freezing cold room having to use the bathroom for two hours when the police abruptly left without explanation. Someone who feels free to leave or feels some agency over his circumstances gets up to go looking for them and says, what's going on? Someone who feels free to leave when he tells them, I have dinner plans at 530, and they leave him alone in the room for another hour until 528, goes looking for them to say, what's going on here? It's important to note, Your Honors, that when the officer returned to the room after the second break and said, how are you doing? I mean, the first thing he says is, you had any opportunity to give any more thoughts about your dealings with those individuals during this last little bit here, you know, clearly calculated understatement that emphasizes the coercive impact of the cooling the heels portions of the two-hour break and the one-hour break. But when they come back and say to him, how are you doing? What he says is, I'm freezing and I have to go to the bathroom. The officer ignores that. He questions him for another half hour, later testifies falsely that he would have let him have a bathroom break. It's also important to note, Your Honors, that when Mr. Ludwikowski first raised the possibility of dinner, it was in his dinner plans with his family, it was in the following context. The officer said to him, you can come back to the pharmacy with us later tonight, right, to relieve David Goldfield of his duties so that he can come answer questions. Mr. Ludwikowski says, well, actually, I have 5.30 dinner plans with my family. The officers kind of blow by that and say, well, you know, we're going to need to get some documents from you anyway. And then when he revisits it at 5.30, when they finally come back after that second one-hour break, they simply say to him, this is more important now, isn't it? So the fact that they kept him there, notwithstanding those expressions of both the need to leave and what the government repeatedly characterizes as evasions. Your Honors have seen the video. Your Honors know he is absolutely projecting that he does not want to be answering questions about his own culpability. Now, the government says that means... He did a lot of talking. He did a lot of talking. When you would think that at the end of the second session, an hour and 45-minute session, you think he would slow down at the end. He picked up speed before they took a break. And he kept volunteering things. Absolutely, Your Honor. But we're making our own subjective assessments of what we think is going on in his head. What is not happening... All I know is he was volunteering a lot of information without... I mean, he was taking a question and he was running with it. Your Honor, but what he was not giving the officers is what they were looking for, and that's why the questioning continued. And that was absolute admissions of culpability and conspiratorial conduct. And that's why they kept... Let me ask you this question. Not only your client, Mr. Lew Bukoski, but others who are talking about a present extortion scheme would often be forced to discuss prior criminal activity, prior bad acts of some kind. What standard would you have us and the police apply as it relates to Miranda under circumstances like this? Your Honor, the same standard that this court has required and that the police almost routinely, as the case law reflects, apply when they confront this. As soon as someone starts talking about his own culpability, Your Honor, the officers Miranda-ize and or say, you are free to leave. That is all. We do not by any means question their ability to investigate this conduct. There was a very simple fix here, and it was Miranda. And here's the reason that Miranda mattered, and here's the reason that she mattered in the voluntariness context, because the voluntariness inquiry requires that the witness know and nonetheless agree to make statements that will be used against him. When someone comes in and the government knows that he has come in believing himself to be a victim of an extortion and is there to talk about an extortion. And by the way, Your Honors, the extortion was solved. He had already given the names of the individuals. He had already given their motive, told the police that he had cut them off in February, explained to the police why, given the police the facts that had prompted him to cut them off. He had told the police about the research he'd done on social media to identify the person who had made the threat. All of this had been done, Your Honors, before he even walked in to the police station on June 24th, and it was reiterated in the first non-custodial portion of the interview. The follow-up questions, why do they think you're in partnership? What in your heart do you think they were doing with all those pills? Doesn't it seem to you like they thought you were in some sort of business together? Those questions, Your Honor, were on a different topic. They were questions on a different crime. The problem isn't the questions. The problem is was he subject to a custodial interrogation? That is, would a reasonable person perceive that she or he was free to leave? Yes, Your Honor, and there are two factors that those questions illuminate on that very issue, as the Court knows, and Your Honor wrote, the seven factors in the Jacobs case. One is questioning that is confrontational or intimidating. Actually, there are three. Third is information known to the questioners about the defendant's own culpability. The question was for somebody that she had been an informant for, I guess, close to ten years or whatever it was, if I recall, and the officer really turned on her and summoned her to a meeting. Where is the summoning of Mr. Lutikowsky to a meeting here, and where is this a case where somebody in a very harsh way tries to, in effect, take control of your conduct? Your Honor, there are undoubted factual distinctions, and Your Honor's pointed to two of them with Jacobs, but here's a key point of correspondence, and it is, in fact, the seventh of the Jacobs factors, which this Court applies to all sorts of custodial interrogation questions. Whether the witness understood that the questioning would address his criminal conduct. Now, when the witness does not realize, walking into the interview, that he's the suspect, that he's being questioned about his own conduct, he isn't there only as a victim, there is a very simple mechanism for ensuring that he is informed of his rights, which dispels the inherent coercion that this Court has repeatedly said must be carefully scrutinized, that inheres in questioning in a police station. And that's just give him a Miranda warning, or just tell him he's free to leave. Assuming he's in custody. Assuming he's in custody. But he is in custody, Your Honors. When Your Honors look at those seven factors, the location, the information known to the questioners, whether the questioning was confrontational or intimidating, the use of tactics, to Your Honor's first point, not all of this interrogation was confrontational and accusatory and pound the table, but Miranda itself was predicated on the idea that modern psychological interrogation entails some of that good cop, bad cop. But on June 24th, he went to the station voluntarily, did he not? He went to the station voluntarily in the same way that Ms. Jacobs did, Mr. Swint did, in any one of these cases, of course. He was told, after having made a report, I need the help of the police. But it cannot be the price of seeking the police's help that they then can ask you about all of your other criminal conduct that was not part of what you went in expecting to be asked. And when the witness does not know that he will be questioned about his own criminal conduct, that is something that weighs against the government and in favor of a custody finding. What do you make of the fact that he wasn't arrested for two years after this conversation or interrogation? And Judge Simandl makes note of that in his oral opinion. It's nothing that could possibly shed light, Your Honor, on the objective inquiry of what a reasonable person would think at the time of the interrogation. And it's also nothing that could shed any light on the subjective question of whether his will was overborne during the questioning. And the fact that he continues to seek the help of the police simply reflects the fact that he continues to think of himself as a victim and not as a suspect. So at that point, Your Honors, it's actually corroborative of our point that he lacks the information that is essential both to making a no involuntary waiver of his rights and having been put in that position, it's also a factor that weighs in favor of the finding of objective custody. I see I'm out of time. We'll get you back on your part. Thank you. Mr. Gross. Good afternoon. I'm Assistant United States Attorney Norman Gross on behalf of the appellee. Your Honors, when Mr. Lewd-Wilkowski showed up at the Medford police station, he did so because he had just received a letter that said, no one is safe unless you meet our list of demands, not your kids, your family. I saw you pick your sons up one night at the house. I know what you've been doing for years. I don't want to hurt anyone innocent, but I will. I will attack innocent first and you and Dave last. When Mr. Lewd-Wilkowski shows up at that police station, he is, as far as the police are concerned, potentially a victim of a potentially very violent crime. That makes him very different in terms of the custody analysis, as Judge Zamanda pointed out, from every other case where this court and the Supreme Court has found custody even without a formal arrest because that requires restraints comparable to those of an arrest. Now, the test is an objective one. So what would an objectively reasonable person believe when he's in that situation? His uncle, an FBI agent, has arranged for him to have this interview. And he and the police are absolutely treating this extortion threat as a serious crime. Now, they ask him a lot of questions about his relationship with the extorter because they need to know before they go out and they make arrests or apply for warrants that they have a complete understanding of what is the basis of this extortion. Is this a real extortion? How serious is it? And how emergent is it? The questioning does change at some point to say, you know, it looks like these things, they think you're part of the deal. You're part of their group. And you've now stopped dealing with them. What gives? When you look at the Jacobs, the factors we set out in Jacobs, the questioning took place at a police station. The interviewing officer, I don't know if he believed Mr. Lutikowsky was guilty or not. He said he didn't. So let's put that in his favor. He wasn't summoned there. He went on his own volition. That helps your position. There were some, as Ms. Mathewson noted, some interrogating tactics, if you will, I mean, to try to get him to fess up to certain things that they suspected he might be doing because, remember, they had been investigating him three years prior to that. He communicated to Lutikowsky that at one point, you could be guilty. Something's going on. He felt obligated. Well, you know, it gets a little close to the line as to whether a reasonable person, not this person, but a reasonable person might think, this doesn't feel right. I came here on extortion, and now they're looking at me. Yeah, where is that line? I mean, isn't there a point where you're going beyond the questioning about the extortion to questioning about the criminal conduct of the person who's there? Your Honor, as Judge Demandle found, and he's absolutely right about this, there is not a dichotomy in this case between the extortion and the unlawful dispensing. They're inextricably intertwined, and the police know that from the get-go because they've got these cryptic text messages saying things like, we know what you've been doing for years. There's no I in team. You can't drop the ball in the ninth inning. They also know that Lutikowsky has identified, and can I just pause for a moment? Ms. Matheson said that the extortion had been solved. That's absolutely not the case. The police absolutely had to get additional information and assure themselves that Lutikowsky wasn't in here. He didn't make this stuff up. But prior to the first break, they had a pretty good idea who it was that was responsible for the extortion. But they, Your Honor, they did have an idea. But Mr. Lutikowsky was continuing to say things like, well, this Crystal Wood, my employee, may have been involved with this. She's buying pot from these guys. She may be stealing drugs. And that's why they continued to question him about that. At one point, I think it was 319 on this tape. Not the time, but the time on the tape. He's told in no uncertain terms that they've been investigating him since 2010. And the thing looks like a proffer. They pull a lot of pictures out. They start confronting him with pictures. And isn't that more akin of an interrogation of somebody that you suspect is involved in criminal activity? Let's assume that there are, and I'll admit, yes, there are accusatory aspects to that questioning. But here is the bottom line that Judge Simandl got right. This guy is in here, you know, terrified. He said at one point, when I got this letter, it knocked the breath out of me. He's in there. He needs the police to go out and take action. But at one point, they said, if you want us to protect you, you better come clean. I mean, it sounds like... That's a truism, Judge Ambrose. They can't go out and crank up this criminal justice machinery. But the point is, if he said, I'm not going to cooperate with you at all, and I'm going to walk out, they still have to protect him. Come on. Well, but they might at that point say... I mean, if he gets whacked outside the police station, you can imagine there would be a whole lot of bad publicity in the papers. That's right. And they probably would. But while they have him there and while they're talking to him, and at that point, they've never said to him, you can't leave. They haven't even said to him, we want you to stay. So why not Miranda? Because he's not in custody. He's not in custody. An objectively reasonable person would not believe that they were in custody. Because look at what they're asking him about. They're asking him about dispensing practices. This comes back to the key question that Judge Fisher asked. If you were to suggest a refinement of what we said in Jacobs, what would that be as to when there is and is not a custodial interrogation? Because that's the key question. I mean, that's it for us. Yeah. This is, and I absolutely agree with Ms. Mathieson, this is a very unusual case. And in a case where a person is not brought to the police station, but asks to come in. This is different even from Mathieson and Beeler. It's not unusual in dealing with extortion. That's right. But extortion cases, thankfully, are fairly rare. So you've got an extortion victim contacting the police and saying, I want to come in and talk. But you've got a special kind of case here. You do. And for this reason, because an extortion victim, almost of necessity, has something that he's trying to hide. Right. And the police need to know what that is. They need to know that this looks like a real extortion based on this letter. But it's possible that it's a fake. Or it's possible that Lew Bukowski is trying to get somebody in trouble. One of the things that's important here, because of the content of the texts and letters that were part of the extortion, the police had to know and a reasonable person would be in a circumstance where they're under a lot of pressure. They're being threatened. Their family's being threatened. You know, they're concerned about safety. So isn't that a factor that is part of the Miranda analysis on both free to leave and voluntariness? It is. But here I think, taking a step back, an objectively reasonable person in Lew Bukowski's position is in there talking to the police about a violent extortion that may be targeting his children. And they're asking him about some dispensing practices that took place years ago and which everybody seems to agree has now stopped. Would an objectively reasonable person think that they are not going to be free to leave at that point when you marry those two things up? He's got an objectively reasonable person in Lew Bukowski's position thinks, look, they're asking me some uncomfortable questions here about something that they knew about 10 years ago and they didn't do anything about. And by the way, he keeps denying and denying that he's done anything wrong. He's saying I was negligent, I was naive, et cetera. And they're pressing him because he's telling them things that just don't sound right. But an objectively reasonable person thinks I'm going in here, I'm reporting a violent extortion that's threatening my children. At the end of the day, I'm going to be able to get up and walk out of here even though I may have given them some information that down the road may cause problems for me. Because the question is, am I in custody right now? Can I not get up and walk out of this police station if I want to? Or the flip for a reasonable person may be, if I get up and walk out of here right now, they may not protect me. And not only me, but my family may be harmed. And so that really comes back to Judge Restrepo's question. Why not just say, look, you've got a right to remain silent. Just to let you know. And anything you say could be held against you. And you've got a right to an attorney. There's a potential problem with that, Judge Ambrose, because at that point they're saying to him, he's coming there as a victim. They're treating him as a victim. Up to a point. I mean, having watched it, a lot of their questioning, it was very clear they didn't pound the table. They were very matter of fact. And they're going, it just doesn't add up. Just look at this transcript. Look what they're saying. This doesn't make sense unless you're part of this. And by the way, I need to tell you, full disclosure, three years ago we were looking at you. And we didn't go after you. We went after other people. And we got other people. But we didn't go after you. And now dots are being connected. And these are the people. Look at these pictures. Are these the people? These are the people that are threatening you. And you need to come clean with us. That's right. That's right. Because you're asking us to go out there and take action on your behalf. And an objectively reasonable person, and let me just pull back for a second. Ms. Matheson said, well, the reason you can tell he's in custody is because he didn't leave. Well, she's gone back to the subjective considerations that she rightfully pounded me in her reply brief. Don't apply here. What would a reasonably objective person, what would he believe about one issue? Are they going to let me walk out of here at the end of this? Or when I ask to? Are they going to say, no, you're going to have to stay here. We're not going to let you leave, protect your kids who are potential extortion victims, until we get to the bottom of something that we've known about for several years. And we've just, you know, that just is not how an objectively reasonable person would respond to this scenario. You're right that he's probably thinking, I'm not doing myself any favors here talking about my dispensing practices. But that doesn't mean that he would believe that, oh, they're not going to let me leave if I don't answer these questions about dispensing. Let's assume hypothetically we agree with defense counsel here. I'm sorry, Judge. Let's assume hypothetically we would agree with defense counsel. What happens to the conviction? Well, Your Honor, then I would ask that you find that the admission of the challenge portion of the statements were harmless. And the challenge portion, and I'm sorry I didn't emphasize this in my brief, but any custody in this case ends before the second break when Detective Knack tells Lew Bukowski, look, I'm not going to arrest you. You haven't done anything criminal. Certainly an objectively reasonable person in that position knows at that point that they are not in custody. He's come out and said it. And some of the statements that Ms. Madison has pointed to, like she said, well, at the third break, they left him cooling his heels there for a couple of hours, and that showed coercion. That doesn't matter because an objectively reasonable person would say, they told me I'm not under arrest. I can walk out of here. He knows that the door is unlocked. It may be closed. But he's been allowed to go outside and go to the bathroom and come back on his own accord, use his phone. Judge Estepa, you asked that question about the phone, and that's a significant one. Is a person who's in custody who the police are trying to get to incriminate themselves going to be allowed to hold their phone, make a phone call, that they're not going to monitor him when he's alone in the room? During the interview, you saw him on the phone using it at that time. But what Judge Fischer is asking you is beyond this case, what rubric would you suggest that we put into play in order to distinguish between a custodial and noncustodial interrogation? I think that any opinion you write in this case has to address the rather unique facts here, and I'm not sure it's going to have broad application. Just the way that Jacob's doesn't really have broad application. I think what he and now, and I'm supplementing that, or I are asking you to go beyond this case. What rubric would you suggest? We don't offer this opportunity to too many people. What rubric would you suggest that we put into play in order for future courts to distinguish between what is a custodial and noncustodial interrogation? I think in this case, you should say that although we've identified the factors that a court should consider in determining whether a reasonable person would believe they're in custody, that those factors don't have the same value in every case. And they don't have the same weight, and you have to look at how they relate to each other. And so here, three things about this case that Judge Simandoe focused on are significant. The origins of the investigation, and the status of the defendant as a victim, and the nature of the crime that's under investigation. The extortion. All of those things. Because the origin of the investigation is that he went to the cops through his uncle, rather than they coming to him. That means that the fact that the interview took place in the police station is less significant than it would be if the police had summoned him in. But when it became clear, when the questioning became clear, that Ludwikowski committed a crime, what's the harm, particularly under this set of facts, when they knew the identity of the extortioners? What would the harm be in giving him a rando warning? There's no harm in giving him rando warnings. There's no harm in saying, you're free to go, you're free to go, you're free to go. The question is, were his constitutional rights violated by the absence of those statements? And the answer is, unless an objectively reasonable person would believe they were in custody, his rights were not violated. And suppression of these statements. Remember, suppression is a remedy that undermines the truth-finding function. Couldn't it be that a reasonable person, under these circumstances, once they began being questioned about facts that would implicate them in crime, might not think that they're free to leave? The mere fact that you cross that threshold, that the questions went into their own criminal activity, wouldn't that lead a reasonable person to think, you know, I started this whole thing. Now I'm talking about myself. I just can't walk away from here. So, Judge Fischer, again, in the Jacobs case, when the informant was brought in, thinking that she was going to just talk to her handler, and wasn't going to be questioned about her own criminal conduct. That's because they ambushed her, in a sense. Here, Lew Bukowski could not have been ambushed. He must have known, an objectively reasonable person would have known, when they turned over these text messages and this letter, that there were going to be questions about what this stuff means. What do these cryptic emails mean? What are they referring to? What's your relationship? Any objectively reasonable person would know, and anticipate, and not be surprised. And would have anticipated that they're going to get these questions. And the fact that they're going to get these questions doesn't mean that they're going to be locked up. So that the accusatory questions here are very different than in another context, where someone is brought in, not as a victim, not as a victim of an extortion, but someone who would understand. But here he had Crystal Wood in his mind. He was laying a lot off on Crystal Wood. There became a point where it was clear that the questioning wasn't going to end with Crystal Wood. Wouldn't that be enough? Wasn't that the stage, perhaps, that they should have given a Miranda warning? Your Honor, I don't think so. I think Crystal Wood was a distraction. It showed, as Judge Simandoe pointed out, that Luke Wachowski, another point that shows that he doesn't feel that he's really in custody is, he's controlling this interview to some extent. Certainly much more than if the police are bearing down on him, trying to get him to incriminate himself about something other than what he came in for. He spent ten minutes early on in the interview complaining about what a crappy employee Crystal Wood was. And what did FBI agent Montgomery say? Look, we've got to get back to the extortion. Remember, they keep focusing relentlessly, including during the challenge period, on the extortion. They keep going back and said, let me read another one of these text messages. What does this mean? During that challenge period. But then they go further at times and say, doesn't this mean you're part of the group? But that doesn't mean that we're going to lock you up. Because you may have been part of the scheme. That just means we understand now what this extortion is about. It's a real extortion. They really have the goods on you. This isn't some fake. This is something that you have genuinely a reason to be worried about. It's a real extortion. And because we know that, and because it took us quite some time to get you to concede that, yes, I do have a relationship with the people that are sending me this stuff, even after he hedged and hemmed and hawed, that's when they said, okay, you did the right thing. You finally came to us. You should have come to us a long time ago. You should have come to us when you got the first text message on the 18th. But what did they do? They then went out. They got a data warrant. They went proactive. They set up a sting where they got Dantes Jones to come in, and they locked him up. So that, an objectively reasonable person, I think, would understand that being questioned about the basis for the extortion is not something that's going to cause these officers to tell him, you're not leaving here tonight. We're locking you up. All right. Thank you very much. Thank you. If you have no other questions, I just ask that you affirm. Thank you. Your Honors, in response to the Court's invitation, Mr. Gross just made a breathtaking suggestion, that this Court take an objective inquiry designed to protect Fifth Amendment rights and customize the application of the test for the reasonable person. We're going to offer you the same degree of respect. Thank you. What would you suggest should be the test that we would do to refine when there is and is not a custodial interrogation? The Jacobs factors work, Your Honor. The Jacobs factors work. The problem with factors, I don't even know why I did factors in Jacobs. Factors tend to be, I've said this time and again, factors can be whatever you want them to be. You add them up, you add them up, and however you want them to come out, they come out. And I've seen this in all kinds of areas of law. So maybe they're helpful here, and Jacobs thought that they were. That was a pretty tough situation for this person. But is that it? There's no further refinement beyond Jacobs? Perhaps, Your Honor, if I could explain why I think they do work. As Your Honor's careful opinion in that case reflects, the Fifth Amendment is what we're really talking about here. Miranda, of course, has gotten somewhat unmoored from it. We tend to think of it as independent of that. But really what we're talking about is ensuring that somebody has the meaningful opportunity to assert their Fifth Amendment rights. And so the question is, what are the factors that are going to influence their ability to assert their Fifth Amendment rights? And one of the aspects of it, of course, is the inherent coercion in the custodial interrogation. The inherent coercion matters because it's coercion that's going to threaten to override the Fifth Amendment. So when we start talking about how do we determine whether somebody's in custody, what we're really asking is, what are the factors that are going to influence this person's ability to know what their rights are and to resist the coercion inherent in the stationhouse interrogation setting in particular? So the reason that those factors work is precisely because they are flexible. But Mr. Gross's really breathtaking suggestion was that there should be more leeway for questioning when somebody's a victim. There should be more leeway for questioning when somebody's uncle set it up. That's backwards, Your Honor. First, just as a matter of public policy, and that's not how we do constitutional law. I'm not sure he said it quite that way. But if the idea is that someone who needs police help is subject to a broader range of questioning about separate criminal conduct of their own than someone who doesn't need police help, that's backwards in terms of the Fifth Amendment. Because it's the person who can't leave because they're afraid because their kids are being threatened who already has an impaired ability to say, no, I'm going to remain silent. And the person whose uncle set up the interview is closer, not as close, of course, Your Honor, but closer to Ms. Jacobs than the ordinary person walking in off the street. So Mr. Ludwikowski is in this interrogation because his uncle said, I'll set you up with my colleagues at the FBI and they will take care of you. Interestingly, Your Honor, what the government doesn't mention is that Agent Hyland, one of the FBI agents, actually testified at the suppression hearing that he understood that the question on the table at that time, because there was, in fact, an open investigation, not a 3-year-old or 10-year-old, as Mr. Gross said, investigation of Mr. Ludwikowski. There was an open investigation. And what Agent Hyland said, this is at Volume 2 of the appendix at 105, was the question is what is the defendant's involvement in his customer's business, something like that, I'm paraphrasing. So all of that is known to the police. But it looks like here, even if you took all of these statements during these incriminating statements off the table, within the next two years, they get two people to testify against him who were part of the group with him, allegedly. We get the assistant at the pharmacy to testify against him. And I believe that the assistant also had pled guilty. And so even if you were to have suppressed all of these statements made on June 24, isn't there overwhelming evidence against Mr. Ludwikowski? As your Honor knows, we're under Chapman versus California constitutional harmless error. It is not a question whether he would have been convicted without it. The question is, can the government demonstrate that the conviction is surely unattributable to the error? And the closing argument, your Honor, literally said the confession is the foundation of the case. Now, this court said in Brownlee that when the government relies heavily on a confession, it cannot be constitutional harmless error. The court also said in Brownlee that when the admission of a confession influences the defense strategy, it cannot be harmless error. The Supreme Court said in Arizona versus Fulminante, there is no evidence like a confession, a recorded confession, a four CRI. I think at least in Brownlee, I didn't do factors. Did I correct your Honor? But the reality is that the government can't meet the constitutional harmless error standard here. And I would like to respond to Mrs. Mr. Gross's point about the statement. You're not under arrest. First, we contend that that's a tactic. But regardless, even if the court were to say that that statement terminated any arrest means you don't think you have to stay here. Your Honor, there is case law and I don't have anything from this circuit at hand, but there is case law that says you are free to go. There's a seventh circuit case on this is far more powerful. And in fact, required to terminate custody. You are not under arrest. It's a negative implication. And it's a legal concept that a lay person may not understand. And so if they had said to him, you're free to leave at any time that unquestionably would have terminated. You're not under arrest. Does that mean I'm free to leave? I'll bet the answer would have been yes. Probably it would have been. And you know what, your Honor, we wouldn't be here at least as to that portion. But let me just point out one thing about the record, because that portion actually comes after three of the most incriminating statements that the government concedes were not duplicated by other evidence. And those are the statements that are recounted on pages 27 to 28 of my reply. Two more minutes. I'm going to hold you to two minutes. Those are statements we counted on pages 27 to 28 of my reply brief. Mr. Lubickowski admitting he'd filled hundreds, if not thousands of fraudulent prescriptions. This profit would cause a lot of people not to ask questions. Between the first and second break. They were. Yes. Between the first and second break. But importantly, your Honor, before the statement, you're not under arrest. So even taking Mr. Gross's hypothesis that that terminated the custody, which it didn't, that would not actually make the error harmless. Your Honor, Judge Amber's question on the leveraging the fear. You know, really what we have to remember here is this is unusual because he is being And the example of the other cases, including all of the other cases, the government cited is as soon as a defendant starts talking about his own conduct, either there are Miranda warnings or the questioning is terminated entirely. But what's super interesting here, your Honor, is that the swing's case is really the only case that either party has cited in which a defendant was questioned about different conduct than he expected to be questioned about. This is different even than Jacob's. This Jacob's was kind of trying to have it both ways, perhaps cooperating, but not wanting to talk about her own conduct. That's not what we have here. What we have here is closer to Swint where somebody goes in thinking he's there to talk about one thing and then is asked about different later conduct of his own. And as the court knows in Swint, this court said that there could not be a voluntary waiver of the right. It's almost impossible. He would not have been asked about his involvement. When you look at those, the letter and the transcripts, I mean, they beg the questions that the officers asked. Your Honor, not to solve the extortion. Again, the officers were perfectly welcome to investigate. We understand why they did. And there are very easy safeguards that they could have employed and they didn't. That's why we're here. Thank you. Thank you to both councils. Always a privilege to have both of you here. We'll take recess.